Kristy S. DOWNS, Individually, as Personal Representative of the Estate of Ivan Dean Downs, and as guardian of Suzanne and Matthew Downs, Appellant–Plaintiff,

v.

PANHANDLE EASTERN PIPELINE COMPANY and Vesta Energy Company, Appellees–Defendants.

No. 61A05–9701–CV–14.

Court of Appeals of Indiana.

May 29, 1998.

George M. Plews, Jeffrey D. Claflin, Donna C. Marron, Plews Shadley Racher & Braun, Indianapolis, for Appellant–Plaintiff.

Thomas J. Costakis, Jeffrey C. McDermott, Linda J. Cooley, Krieg DeVault Alexander & Capehart, Indianapolis, for Panhandle Eastern Pipe Line Company.

Keith A. Kinney, Alan J. Irvin, Hill Fulwider McDowell Funk & Matthews, Indianapolis, Mark E. Christensen, Christensen & Ehret, Chicago, IL, for Vesta Energy Company.

## OPINION

SHARPNACK, Chief Judge.

Kristy Downs, individually and as personal representative of Ivan Downs and guardian of Suzanne and Matthew Downs, appeals the trial court's grant of summary judgment in favor of the defendant-appellees, Panhandle Eastern Pipeline Company ("Panhandle") and Vesta Energy Company ("Vesta") (collectively "Appellees") determining that no duty was owed by either of them to the Downs. Downs asserts that the designated evidence establishes a genuine issue of material fact that precludes summary judgment. The case arises from a natural gas explosion at the Downs' home.

We affirm.

### Standard of Review

The issue raised for our review is whether the trial court erred in granting summary judgment. When we review a trial court's grant of summary judgment, we apply the same standard as the trial court. *Ayres v. Indian Heights Volunteer Fire Dep't, Inc.,* 493 N.E.2d 1229, 1234 (Ind.1986); *see* Indiana Trial Rule 56. The appellant bears the burden of proving the trial court erred in determining that there were no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law. *Rosi v. Business Furniture Corp.,* 615 N.E.2d 431, 434 (Ind.1993). Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmovant. *Cowe v. Forum Group, Inc.,* 575 N.E.2d 630, 633 (Ind.1991). "A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue." *Scott v. Bodor, Inc.,* 571 N.E.2d 313, 318 (Ind.Ct.App.1991).

### Facts

The facts most favorable to Downs, the nonmovant, follow. Montezuma Municipal Gas Utility ("Montezuma") sold and delivered natural gas to customers, including the Downs, through a distribution system installed, maintained and owned by the Town of Montezuma. The gas, which Montezuma purchased from Vesta, was produced from gas fields in western states including Kansas. The gas was transferred by Vesta to Montezuma at Haven, Kansas, and reached Montezuma's distribution facility through a pipeline system operated by Panhandle. Montezuma contracted with Panhandle for the transportation of its gas through Panhandle's pipeline. The natural gas produced by Vesta and transported through Panhandle's pipeline was odorless. Montezuma, after receiving the gas from Panhandle's pipeline into its own system, added odorant to the gas, utilizing apparatus and odorant it purchased from Natural Gas Odorizing, Inc. ("NGO").

Montezuma's gas distribution system was installed in 1934 and consisted of bare steel pipe buried in the ground. The service line to the Downs' home was installed in 1942. Because bare steel pipe is susceptible to

corrosion, federal regulations now prohibit installation of this type of pipe. However, bare steel pipe installed prior to 1971 do not have to be replaced. In 1992, Montezuma began a project to replace the bare steel pipe in its system with polyethylene pipe which is less susceptible to corrosion.

In the early morning of January 21, 1993, natural gas from a ruptured service line seeped into the foundation of the Downs' house in Montezuma, Indiana. During this time, Kristy and her two children, Suzanne and Matthew, were asleep. Around one o'clock in the morning, Downs' husband, Ivan, returned home from work. When Ivan added logs to a wood burning stove, the gas ignited. The subsequent explosion destroyed the house and fatally injured Ivan. Kristy, Suzanne, and Matthew survived, but received serious injuries from the explosion.

The National Transportation Safety Board ("NTSB") investigated the explosion and determined that the gas leak came from a corroded bare steel service line to the Downs' home. The steel line apparently had been ruptured by a growing tree root. Shortly after the explosion, a check for the presence of odorant at a nearby residence confirmed that the gas odorization system was functioning.

### Procedural History

Downs brought this action for wrongful death, personal injury, and property damage resulting from the explosion against the Town of Montezuma, Montezuma Municipal Gas Utility, Utility Safety and Design, Inc. ("USDI"—the contractor hired by Montezuma to inspect and advise concerning the pipeline system), and Panhandle. In the complaint, Downs alleged that Montezuma negligently operated "an antiquated and unsafe pipeline system." Record, p. 10. Downs also alleged that both Montezuma and USDI negligently failed to inspect the service line to her home and failed to cathodically protect the line.[1] In addition, she alleged that Panhandle negligently supplied

natural gas to Montezuma and failed to odorize the gas.[2]

Downs subsequently filed an amended complaint, adding Black Pipeline Construction, Inc. ("Black"—hired by Montezuma to perform work on the pipeline system), NGO, and Vesta as defendants. In the amended complaint, Downs alleged that Black damaged the service line to her house, that NGO failed to odorize the gas, and that Vesta negligently supplied the gas. Both Panhandle and Vesta denied the allegations against them.

Panhandle and Vesta each moved for summary judgment. Panhandle claimed that as an interstate transporter of natural gas, it merely carried the gas through its pipeline to Montezuma's service lines. As such, Panhandle contended that its liability ended once it delivered the gas to Montezuma and that it had no duty to investigate the conditions of the service lines or to odorize the gas. Vesta admitted that it provided the gas which was transported through Panhandle's pipelines. However, Vesta likewise claimed that its liability ended once the gas was delivered to Montezuma and that it had no duty to investigate the conditions of the service lines or to odorize the gas.

Downs responded to both motions for summary judgment. Downs reasserted that both Panhandle and Vesta negligently supplied natural gas to Montezuma and failed to odorize the gas. In addition, Downs raised a new claim that Panhandle and Vesta were liable under a product liability theory. Specifically, she argued that the natural gas was unreasonably dangerous.

Following a hearing on the motions for summary judgment, the trial court entered summary judgment in favor of Panhandle and Vesta.

### Introduction

■ Before we turn to the merits of this appeal, we make some preliminary observations about the nature of natural gas as a

---

1. Cathodic protection prevents corrosion of steel pipes in soil.

2. Because natural gas is odorless and therefore not detectable in circumstances where it could

be ignited unintentionally and cause harm, it is required to be odorized by use of a suitable odorant so that its presence can be detected by smell.

background for our analysis. Natural gas is, as a matter of law, a dangerous substance. *South Eastern Indiana Natural Gas Co., Inc. v. Ingram,* 617 N.E.2d 943, 952 (Ind.Ct. App.1993). However, the utility of natural gas is derived from the very qualities that make it dangerous. It is gaseous and flammable. Because it is gaseous, it can be moved through pipes and apparatus as needed. Because it is flammable, it can burn and produce heat for various purposes. Natural gas is odorless, which makes it unreasonably dangerous because its unintended presence cannot be detected and it is explosive when mixed with air. Because natural gas is odorless, governmental regulations and common sense due care require that an odorant be added to it where it is to be used by ordinary consumers so that they will realize that gas is present when and where it should not be. Properly odorized natural gas is not unreasonably dangerous for use by ordinary consumers. *See generally Jones v. Hittle Service, Inc.,* 219 Kan. 627, 549 P.2d 1383 (Kan. 1976).

Because of the hazards associated with handling natural gas, a gas utility must function under the comprehensive system of state and federal regulations that govern gas distributors. *See* Ind.Code § 8–1–22.5–1 to 12 (Gas Pipeline Safety). As part of that regulation, a gas utility is required to comply with all safety standards, inspection and maintenance protocols, and record keeping and reporting requirements. I.C. § 8–1–22.5–6.

*Discussion*

Downs contends that the designated evidence establishes a genuine issue of material fact that precludes summary judgment. She asserts that the liability of the Appellees is established under several theories. Her application of these theories generally depends on her contentions that the Appellees knew or should have know that: 1) the gas was not or would not be properly odorized by Montezuma; 2) the type of pipe used by Montezuma for distribution was unsafe; or 3) there was a problem with the particular pipe that leaked and caused the explosion. She continues her argument by asserting that such actual or constructive knowledge imposed upon the Appellees a duty to inspect Montezuma's distribution system to determine its

safety, to cease selling gas to Montezuma if its system was found to be unsafe, and to warn Montezuma and the Downs about the dangers previously noted. We will address these contentions in light of the several theories upon which she relies.

### I. Negligence

■ Downs argues first that the Appellees did not establish that they were entitled to judgment as a matter of law on her common law negligence claim because the Appellees failed to demonstrate that they did not owe her a duty of care. At the outset, we recognize that summary judgment is generally inappropriate in negligence cases. *Tibbs v. Huber, Hunt, & Nichols, Inc.,* 668 N.E.2d 248, 249 (Ind.1996). Issues of negligence, contributory negligence, causation, and reasonable care are more appropriately left for determination by a trier of fact. *Houin v. Burger,* 590 N.E.2d 593, 596 (Ind.Ct.App. 1992). Whether a duty of care exists, however, is a question of law to be decided by the court. *Tibbs,* 668 N.E.2d at 250.

When the defendant in a negligence case moves for summary judgment, it has the burden to show the uncontroverted nonexistence of a least one of the elements of the plaintiff's case. *Jarrell v. Monsanto Co.,* 528 N.E.2d 1158, 1162 (Ind.Ct.App.1988), *reh'g denied, trans. denied; see Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1235 (Ind.1994). The elements of negligence are (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to that standard, and (3) an injury proximately caused by the breach of that duty. *Mullin v. Municipal City of South Bend,* 639 N.E.2d 278, 283 (Ind.1994). Absent a duty owed to a plaintiff by the defendant, there can be no actionable negligence. *Lewis v. City of Indianapolis,* 554 N.E.2d 13, 16 (Ind.Ct.App.1990), *trans. denied.*

To succeed in her negligence claim, Downs must demonstrate that the Appellees owed her a legal duty. Downs does not contend that a statutory duty was owed, but rather that a common law duty existed. Downs relies on our decision in *City of Indianapolis*

*v. Bates* to support her contention that a gas supplier and transporter are liable for unsafe conditions of gas distribution pipes owned and maintained by a local gas utility. *City of Indianapolis v. Bates,* 137 Ind.App. 227, 205 N.E.2d 839 (1965). Appellees assert that Downs has misconstrued the holding in that case. We agree.

In *Bates,* the plaintiffs brought suit against a local gas company after a gas explosion damaged the plaintiffs' house. The explosion occurred after a third party had installed flexible brass tubing to supply gas to the plaintiffs' gas range although such tubing is known to be unsafe when used for natural gas. Employees of the gas company had inspected the plaintiffs' house and pipes after the installation but did not notify the plaintiffs of the problem with the brass tubing. This court affirmed the jury's verdict for the plaintiffs holding that the gas company could be held liable after acquiring knowledge that unsafe tubing had been installed. *Id.* at 243, 205 N.E.2d at 847.

Downs asserts that our holding in *Bates* is that "a gas provider *is liable* for damages cause[d] by the *failure of equipment installed and under the control of another party* when the provider knows or has reason to know that injury may result from its continued provision of gas." Appellant's brief p. 15 (original emphasis). Thus, she concludes that the Appellees should be liable because, despite the fact that the Appellees had no control over Montezuma's distribution lines, they knew or should have known that Montezuma's distribution lines were unsafe.

■ However, Downs reads *Bates* too broadly and, in any event, it is distinguishable on the facts before us. In *Bates,* we noted that "the appellant gas company did enter the premises, examine and test all appliances and gas pipes and tubing in such home and *thereby upon assuming such duties* became responsible for its negligence." *Bates,* 137 Ind.App. at 243, 205 N.E.2d at 847 (emphasis added). We reasoned that the gas company had a duty to the plaintiffs because its affirmative act of inspection placed upon it the duty to act once it became aware of unsafe conditions. *Id.* In the case before us, the Appellees did not inspect the distribution pipes under the Downs' home or elsewhere in Montezuma's

system, nor did they acquire any actual knowledge of dangerous conditions that required remedial action.

To accept Downs' reading of *Bates* would stretch the reach of liability to the point where the Appellees and others with an indirect relationship to gas consumers would be required to directly inspect gas pipes not within their means to inspect. In *Bates,* we further noted that "[t]he negligence in such cases consists not in failing to inspect the pipes of the owner of the building, but rather in furnishing the gas through the pipes after obtaining knowledge or information that would suggest to a person of ordinary care and prudence the danger of allowing the gas to pass through such pipes." *Id.* (quoting *Southern Indiana Gas Co. v. Tyner,* 49 Ind. App. 475, 488, 97 N.E. 580, 585 (1912)). Thus, we conclude that *Bates* does not impose liability upon the Appellees.

■ Indiana courts, heretofore, have not determined whether a gas supplier or gas transporter has a duty to a customer of a local gas company to insure that the distribution system of the local gas company is safely maintained and operated. For guidance, we turn to the case law regarding the common law duty of care. In deciding whether to impose a common law duty, we consider and balance the following factors: (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) the public policy concerns. *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind. 1991), *reh'g denied.*

We first consider the nature of the relationship that exists between the Appellees and the Downs. In determining whether a relationship exists that would impose a duty, we must consider the nature of the relationship, a party's knowledge, and the circumstances surrounding the relationship. *Murphy v. Target Products,* 580 N.E.2d 687, 688 (Ind.Ct.App.1991), *reh'g denied, trans. denied.*

■ There is nothing in the designated evidence to support, nor does Downs contend, that a contractual relationship existed between the Downs and the Appellees. The absence of privity of contract, however, does

not preclude the existence of a duty. *Webb,* 575 N.E.2d at 996. Appellees assert that they owe no duty to the Downs because they had no ownership or control of Montezuma's pipelines. They cite *Northern Indiana Public Service Company v. East Chicago Sanitary District* ("*NIPSCO*") in support of this contention. *NIPSCO,* 590 N.E.2d 1067 (Ind. Ct.App.1992). *NIPSCO* addressed the liability of an electric utility company for injuries caused by faulty electrical wiring. In *NIPSCO,* we noted that:

"It has been repeatedly held that where the furnisher of electricity supplies the same to the customer, first through its own wires, and then through the wires owned and maintained by such customer, and over which the furnisher had no supervision or control, and an injury results by reason of the negligent manner in which the customer's wires are equipped and maintained, the party who merely sells the current is not liable."

*Id.* at 1073 (quoting *Caldwell v. Alley et al.,* 70 Ind.App. 313, 321, 123 N.E. 432, 434 (1919)). In other words, absent ownership and control of the faulty wiring, a supplier of electricity has no duty for injury caused by the owner's failure to safely maintain the wiring. *Id.* We find the *NIPSCO* case analogous to the present case and instructive on the issue of duty. We see no reason why this rule should not be applied where the utility involved is natural gas rather than electricity.

Our review of the designated materials does not reveal any facts to support the notion that either Vesta or Panhandle had ownership or control over the leaking pipe that released the gas that exploded and injured the Downs. After the gas was transferred to the possession of Montezuma at its distribution facility, the Appellees had no control of either the gas or the pipelines used by Montezuma to distribute the gas to its customers. Therefore, because the Appellees had neither ownership nor control of the defective pipe from which the gas escaped or any other part of the Montezuma system, we hold that there is no relationship between the Appellees and the Downs that would impose a duty upon them to insure that Montezuma's distribution system was safe. *See id.*

We next address the factor of foreseeability. In reviewing this factor, we focus on whether the person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable. *Webb,* 575 N.E.2d at 997. Consideration of foreseeability in the context of duty involves the same considerations as that required in the context of proximate cause, except that it is determined by the court as a matter of law, and not, as is usually the case with proximate cause, by the trier of fact. *Hooks SuperX, Inc. v. McLaughlin,* 642 N.E.2d 514, 517 (Ind.1994). "[T]he more a [party's] conduct involves the likelihood of injury, the greater the justification for recognizing a legal duty." *Stump v. Commercial Union,* 601 N.E.2d 327, 332 (Ind.1992).

Downs' arguments center around the assertion that the Appellees, because of certain characteristics of Montezuma and its gas distribution system, should have known that Montezuma's distribution system was unsafe. Her argument is based on the designated evidence showing that:

"Vesta and Panhandle knew that they were supplying to an unusual customer, a very small utility. They knew or should have known that the level of sophistication of gas utilities, their equipment and employees vary widely. They knew or should have known that small utilities are more susceptible than large utilities to pipeline safety problems resulting from use of bare steel as opposed to more modern safer pipelines. They knew or should have known that the technical sophistication of employees at small utilities such as the Montezuma Utilities tends to be low. Thus, Montezuma's size alone put Vesta and Panhandle on notice that the utility to which it [sic] was supplying was unusually susceptible to safety problems resulting from outdated equipment and/or inadequately trained personnel."

Appellant's brief, pp. 17–18 (citations omitted). Further, Downs points to Montezuma's annual regulatory reports which were apparently available for the Appellees upon request, and perhaps even received by Panhandle. These reports indicate the number of leaks requiring repair and that a large por-

tion of Montezuma's pipes are bare steel, a material that the gas industry universally accepts as a potentially unsafe material.

We do not find that these alleged facts support an inference that the Downs or other gas customers inevitably were exposed to the danger of explosion. At most, this evidence suggests that, due to its small size and aging equipment, Montezuma's distribution system may have been more susceptible to safety problems. Such a circumstance leaves the foreseeability of harm to the Downs and other customers of Montezuma remote and speculative.

Viewed from a perspective most favorable to the Downs, the most that can be said of any knowledge Appellees might have had (assuming that they had examined the annual reports of Montezuma) about the Montezuma system was that it sometimes experienced leakage and that much of its pipe was bare steel. Short of an actual detailed inspection of the Montezuma system at a level of intensity comparable to that required of Montezuma, they could be expected to know no more. Such knowledge is neither enough to charge them with greater knowledge nor with a duty to acquire more.

However, even if we were to determine that the Appellees had constructive knowledge of the deficiencies of the Montezuma system, we conclude that, because of the tenuous relationship between the Appellees and the Downs, such constructive knowledge alone would not be enough to impose a duty.

This is supported by the *NIPSCO* case, in which we noted that where ownership or control of the utility lines is absent, actual knowledge of the circumstances that created an imminent danger to the injured party is required before liability attaches.[3] *NIPSCO,*

590 N.E.2d at 1073. This would require the Appellees to have actual knowledge of an unsafe condition before they would have a duty to take action. Once again, we find no facts alleged in the designated evidence that would support an inference of such actual knowledge.

Downs also argues that the Appellees had a duty to inquire about or investigate the safety of Montezuma's distribution system. She cites *City of Alexandria v. Allen* to support this contention. *City of Alexandria v. Allen,* 552 N.E.2d 488 (Ind.Ct.App.1990), *reh'g denied.* In this case, we imposed liability on the city when a fireman sustained injuries from a defective fire engine. We held that although the city had no actual knowledge of the defective condition, it was nevertheless liable because it had a duty to inspect the fire engine, which it owned and about which it had received numerous complaints. *Id.* at 496. Downs construes this case to establish that the Appellees had a duty to inspect and thus should be liable regardless of their knowledge.

However, the *Allen* case is distinguishable on the facts before us. In *Allen,* the city owned and controlled the fire engine, thus it had a duty to perform maintenance inspections. *Id.* at 496. Once again, the Appellees did not own or control the distribution system and, as such, they had no duty to inspect the system.[4] *See NIPSCO,* 590 N.E.2d at 1073.

Although we conclude that the Appellees have no duty established through a relationship with the Downs or due to any actual knowledge of the danger, we must still consider whether there is some public policy reason for imposing a duty of care upon the suppliers and transporters of gas to ensure

---

3. In addition, there is case law to support the idea that lack of privity between parties requires actual knowledge on the part of those accused of negligence before a duty can exist. *Webb,* 575 N.E.2d 992, 996 (Ind.1991); *see also Essex v. Ryan,* 446 N.E.2d 368, 374 (Ind.Ct.App.1983).

4. In addition, we note that a duty to inspect arises out of the nature of the party's interaction with the machine or instrumentality. In *Johnson v. Kempler Industries, Inc.,* we held that a trade-in dealer had no duty to thoroughly inspect a piece of machinery it sold to a party because, as an intermediary party, the dealer did not employ

people to inspect the safety mechanisms, did not rebuild any of the machines it acquired, and did not routinely do thorough inspections of the machinery to determine if the equipment is reasonably safe for use. *Johnson v. Kempler Industries, Inc.,* 677 N.E.2d 531, 539 (Ind.Ct.App.1997), *trans. denied.* Here, there is no evidence to support that the Appellees inspected or maintained Montezuma's distribution system or that Montezuma requested that they do so. Therefore, under *Johnson,* the Appellees would have no duty to inspect due to their complete lack of interaction with the system.

that utilities to which they supply gas follow the legal requirements for the operation of such a utility and otherwise exercise reasonable care to protect their customers and others. Such utilities are subject to state and federal regulation with respect to the handling and distribution of natural gas. They are also subject to the obligation to exercise reasonable care. While there is a strong argument that liability should be imposed on anyone that has within their means to inspect, supervise, and oversee the distribution of gas to the public, there is little to be gained by imposing such a duty on one who has no control of or access to the distribution system. The cost of imposing such a duty would exceed the benefit to be gained by requiring the supplier and transporter to obtain access and exercise control in addition to that already in the hands of the utility.

Furthermore, the costs of such a requirement are even less justifiable when considering the state and federal regulations already in place to monitor the safe transport and distribution of gas to the public. Placing liability on gas suppliers and transporters for the negligent maintenance of local gas utilities would be duplicative in effort. Therefore, we agree with the trial court in its conclusion that "[t]he social utility derived from the supply and transport of natural gas to consumers should not be hampered by the imposition of liability based on the negligent acts of distributors."[5] Record, p. 1061.

In sum, there is no genuine issue of material fact with regard to the existence of a relationship between the Appellees and the Downs from either contract or from ownership or control of the distribution system. Nor is there any evidence of actual knowledge on the part of the Appellees that the Downs were in imminent danger of the explosion that caused their injury. Also, we do not find a strong public policy supporting the imposition of such a duty. In balancing these factors, we conclude that the Appellees owed no common law duty to the Downs. *See Webb,* 575 N.E.2d at 995.

Although we conclude that the Appellees owed no common law duty, a party may be held to have assumed a duty where none existed otherwise. Our courts have held:

> "[A] duty may be imposed upon one who by affirmative conduct ... assumes to act, even gratuitously, for another to exercise care and skill in what he has undertaken. It is apparent that the actor must specifically undertake to perform the task he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative legal duty to perform the undertaking carefully."

*Lather v. Berg,* 519 N.E.2d 755, 766 (Ind.Ct. App.1988) (citations omitted), *reh'g denied.* "The mere performance of coordinate or duplicative functions will not suffice." *NIP-SCO,* 590 N.E.2d at 1074.

Here, there is no evidence that either Vesta or Panhandle took active steps to assume a duty to either Montezuma or to Downs. The Appellees never undertook to inspect, repair, or perform any other function with respect to Montezuma's distribution system. Downs suggests that Panhandle may have requested and reviewed Montezuma's annual regulatory reports. These reports indicate the number of leaks reported in Montezuma's system and that approximately half of Montezuma's pipes were bare steel which are more susceptible to corrosion. Regardless of whether there is a factual dispute over whether such reports were actually requested and reviewed by Panhandle, the review of such reports would not result in the active assumption of a duty to insure that Montezuma's distribution lines are safe. Even so, due to the annual inspections performed by state agencies in regulating the safety of gas companies, even the routine review of a gas company's annual reports would be duplicative in nature and thus would still not constitute an affirmative intention to assume the duty to inspect Montezuma's lines. *See id.* Thus, we find no facts in dispute with respect to either Vesta or Panhandle actively assuming the duty to insure the safety of Montezuma's distribution system.

In sum, we conclude that the Appellees had no duty to the Downs either through the

---

5. *Downs raises public policy as a separate basis for imposing liability on the Appellees. However, because we have addressed the public policy* considerations she raises under our analysis of duty, we do not give treatment to her separate public policy argument.

common law or by having assumed any duty towards the Downs. Liability does not attach where there is no duty and without such duty there is no action in negligence. *Estate of Cummings by Heck v. PPG Industries, Inc.,* 651 N.E.2d 305, 312 (Ind.Ct.App.1995), *reh'g denied, trans. denied.* Therefore, we hold that summary judgment with respect to Downs' common law negligence theory is appropriate.

## II. Negligent Entrustment

■ The next theory under which Downs asserts that the Appellees are liable is negligent entrustment. She asserts that the negligent entrustment section of the Restatement (Second) of Torts § 390 is applicable. However, we note that this section of the Restatement is not the law in Indiana. *See Sports, Inc. v. Gilbert,* 431 N.E.2d 534, 537 (Ind.Ct.App.1982). In Indiana, the elements of negligent entrustment are: 1) an entrustment, 2) to an incapacitated person or one who is incapable of using due care, 3) with the actual and specific knowledge that the person is incapacitated or incapable of using due care at the time of the entrustment, 4) proximate cause, and 5) damage. *Johnson v. Patterson,* 570 N.E.2d 93, 97 (Ind.Ct.App. 1991).[6]

■ Unlike the Restatement, which allows such a claim to be based on constructive knowledge, a claim of negligent entrustment in Indiana requires actual knowledge that the person entrusted is incompetent. *See id.* Our review of the designated evidence reveals no evidence to support that either of the Appellees had actual knowledge that Montezuma was not capable of safely handling and distributing the gas.

However, Downs asserts that the evidence does support actual knowledge. She specifically contends that the Appellees had the ability to, and that, in fact, Panhandle did request Montezuma's annual reports containing a description of the type of pipes used by Montezuma and the number of leaks in the system, that Vesta had continual contact with Montezuma for several years prior to the explosion, and that Montezuma was a small, unsophisticated utility. Even if taken as true, none of these asserted facts support an inference that either of the Appellees had actual knowledge that Montezuma was incapable of safely handling the gas that was supplied. Further, as noted by Panhandle, Montezuma was "a gas utility cloaked with competence under state and federal law to distribute natural gas to its customers." Panhandle brief, p. 33. Therefore, because we find no evidence to support that the Appellees had actual knowledge that Montezuma was incompetent to safely distribute gas, we conclude that the Appellees are not liable to the Downs under a negligent entrustment theory.

## III. Duty to Warn When Supplying Dangerous Chattels

■ Downs next asserts that the Appellees would be liable for negligence under the Restatement (Second) of Torts § 388, which imposes liability on a supplier of goods known to be dangerous for an intended use when it does not use reasonable care to inform the consumer of the facts that make the chattel dangerous.[7] We initially note that this theory would not apply to Panhandle because Panhandle is not the "supplier" of the gas, but the transporter.[8] Thus, we

---

6. Downs concedes that the Restatement of Torts is not the law in Indiana with respect to negligent entrustment. However, she urges this court to change the law such that only constructive knowledge is required in a claim of negligent entrustment. To expand the liability of a gas supplier or transporter by requiring it to be liable for that which it should have known, as noted earlier in this opinion, would have a significant impact on the gas industry. In light of this consideration, Downs has not persuaded us to change the longstanding law of negligent entrustment in Indiana.

7. In Indiana, the duty of a manufacturer to give warnings about their products is summarized by

§ 388. *American Optical Co. v. Weidenhamer,* 457 N.E.2d 181, 187 (Ind.1983).

8. Downs argues that Panhandle is a supplier under § 388 and notes Comment C of this section which states that a supplier is "any person who for any purpose or in any manner gives possession of a chattel for another's use." However, to hold that any transporter of goods being supplied through another party is liable to the eventual consumer would require those in the transportation industry to inquire not only about the nature of the product for the purposes of transporting it safely, but also about the intended use of the product and about the knowledge of

address only Vesta's potential liability under this theory.

Section 388 of the Restatement (Second) of Torts provides:

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

RESTATEMENT (SECOND) OF TORTS § 388.

██ However, we conclude that this section of the Restatement does not impose liability on Vesta for several reasons. First, turning to § 388(a), the designated evidence does not present an issue of fact as to whether Vesta knew or had reason to know that the gas it supplied to Montezuma was or was likely to be "dangerous for the use for which it [was] supplied." *Id.* There is no question that natural gas is dangerous. To make it reasonably safe for use, it must be handled properly. Safe handling includes properly odorizing the gas and containing it in a closed system that prevents leaks.

The designated evidence does not indicate that Vesta had any reason to believe that Montezuma would not odorize the gas prior to distributing it. Further, we have already determined that there was also no issue of fact as to whether Vesta had either actual or constructive knowledge of the leaking pipe that caused the gas explosion. *See Jones,* 219 Kan. at 634, 549 P.2d at 1391 (concluding that retail and wholesale suppliers of propane had no liability for an explosion under § 388 because "[n]one of the defendants here knew or had reason to know that the propane

the consumer to whom they deliver. Imposition of such a liability would impose too great a

gas would be piped through a leaky line and from there filter through the earth to a place where it might collect"). Therefore, the designated evidence does not indicate that Vesta had any reason to believe that Montezuma would not handle the gas in a safe manner. Thus, under § 388(a), the Appellees did not "[know] or [have reason to know] that the chattel is or is likely to be dangerous for the use for which it is supplied." RESTATEMENT (SECOND) OF TORTS § 388.

Furthermore, under § 388(b), we conclude that Vesta had "reason to believe that those for whose use the chattel is supplied will realize its dangerous condition." *Id.* The designated evidence indicates that Montezuma was well aware of the dangers of natural gas. In *Jones,* the Supreme Court of Kansas, applying § 388 to similar facts, held that:

"[T]he manufacturer of LP gas who sells it to a distributor in bulk fulfills his duty to the ultimate consumer when he ascertains that the distributor to whom he sells is adequately trained, is familiar with the properties of the gas and safe methods of handling it, and is capable of passing on that knowledge to his customers. A manufacturer so selling owes no duty to warn the ultimate consumer, and his failure to do so is not negligence and does not render the product defective."

*Jones,* 219 Kan. at 639, 549 P.2d at 1394. In other words, if a distributor of gas has adequate knowledge of the dangers associated with the gas it purchases from a bulk supplier of gas, the bulk supplier has no duty to warn the ultimate consumer of the gas. *See id.* at 635–636, 549 P.2d at 1392 (distinguishing bulk supplier situations from situations where a supplier is able to warn the ultimate consumer through the use of a warning label on the packaging).

In addition, a supplier's duty to warn a retailer or distributor of gas is satisfied where there is evidence that the distributor knew of the dangerous characteristics of the gas and the safe methods of handling it and had operated a business distributing it for many years. *Parkinson v. California Co.,* 255 F.2d 265, 268 (10th Cir.1958). "Warning

burden on the substantial industry built around delivering goods to consumers and retailers.

is required to impart knowledge, and if that knowledge has already been acquired, it is not necessary." *Id.* at 269; *see also Shanks v. A.F.E. Industries, Inc.,* 275 Ind. 241, 416 N.E.2d 833, 837 (1981) (holding that no additional warning must be furnished where such warnings would not improve upon the user's understanding of the characteristics of the product).

Therefore, under § 388, we must determine if Montezuma was adequately warned of the dangers, such that Vesta had no duty to warn the Downs or any other customers of Montezuma. The designated evidence clearly indicates that Montezuma was well aware of the dangers associated with transporting natural gas and, in particular, of the potential problems with its own distribution system. This knowledge is indicated by the programs and policies developed by Montezuma to survey, inspect, repair its pipelines and to detect leaks and corrosion. The evidence indicates that Montezuma knew the purposes of odorization and had an odorization system in place to add odorant into its gas to aid customers in detecting leaks. Ricky Nichols, an employee of Montezuma, indicated in his deposition that Montezuma was fully aware of the potential safety problems that could arise with bare steel pipe and that USDI, hired by Montezuma to perform inspections and leak surveys, had recommended to Montezuma that the pipes be replaced. In fact, Montezuma had begun a program to replace the bare steel pipes with pipes less susceptible to corrosion. Further, Montezuma even undertook to warn its own customers of the dangers of gas.

As noted earlier, natural gas is, as a matter of law, a dangerous substance and is regulated by state and federal authorities. *South Eastern,* 617 N.E.2d at 952. The designated evidence reveals that Montezuma did prepare and file regulatory reports and was inspected at least annually by the state agencies.

Therefore, we agree with Vesta that while the evidence designated by the Downs shows that Montezuma may have been negligent in maintaining its distribution system, it does not indicate that Montezuma was not fully aware of the dangers associated with distributing gas generally or through its own pipelines, specifically. Therefore, under § 388, Vesta had no duty to warn Montezuma of these well known dangers. *See Parkinson,* 255 F.2d at 269. Because the evidence indicates that Montezuma was adequately warned of these dangers, Vesta, as a bulk supplier, also had no duty to warn the Downs. *See Jones,* 219 Kan. at 639, 549 P.2d at 1394.

Therefore, we conclude that the designated evidence does not present a genuine issue of material fact as to whether Vesta had a reason to believe that Montezuma would not handle the gas in a safe manner or that Montezuma would not realize that gas is dangerous when not safely handled. *See* RESTATEMENT (SECOND) OF TORTS § 388(a), (b). As such, we conclude that liability is not established under § 388.[9]

Nevertheless, Downs cites *Reynolds v. Strauss Veal, Inc.* for the proposition that a supplier may be held liable under § 388 for failing to warn a consumer of danger even where the intervening negligence of a third party caused the injury. *Reynolds v. Strauss Veal, Inc.,* 519 N.E.2d 226 (Ind.Ct. App.1988), *trans. denied.* Thus, she argues that the Appellees had a duty to warn the Downs of the gas-related dangers to which they were exposed even though it was the negligent maintenance of the pipe by Montezuma that caused the injury. However, we conclude that Downs has misapplied that case.

The *Reynolds* case involved the sale and installment of a veal confinement operation which included a septic system for removal of

9. Downs also asserts that the Appellees are liable under § 389 of the Restatement because they "[knew] or [had] reason to know that Montezuma was unlikely to make their product safe" by odorizing the gas. Appellant's brief, p. 25. However, this court has previously noted that § 389 has not been adopted as the law of this state. *Rogers v. Grunden,* 589 N.E.2d 248, 254 (Ind.Ct.App.1992), *reh'g denied, trans.* denied. In addition, we have already concluded that there is no genuine issue of fact from which it could be found that Appellees either knew or had reason to know that the natural gas supplied or transported by them would not be made reasonably safe for use by Montezuma under § 388. Therefore, we do not address liability under this theory.

animal waste. The supplier apparently knew that the accumulation of methane in the septic tank could be dangerous to anyone entering the tank, but failed to inform the purchaser of this danger. As a result, two men were overcome by methane and died while in the process of cleaning the tank. The defendant argued that liability for their negligent failure to warn the plaintiffs about the danger was relieved because of the intervening negligence of the party installing the tank who had failed to obtain the necessary state permits.

We held that the intervening negligence of the party installing the tank did not relieve the defendant's duty to warn the purchaser of the dangers associated with the methane that would be foreseeably encountered when the purchaser cleaned or performed maintenance on the tank. *Id.* at 229. However, the Appellees are not arguing that Montezuma's negligence in maintaining the pipes relieves them of their duty to warn as in *Reynolds.* They argue that, under § 388, they have no duty to warn. Because we have concluded that under the facts of the present case, Vesta owed no duty to warn the Downs, the *Reynolds* case is not instructive.

### IV. Product Liability

Next, Downs argues that the Appellees did not establish that they were entitled to judgment as a matter of law on her product liability claim. She asserts that the Appellees "are strictly liable to the Downs for their failure to provide any kind of warning to Montezuma concerning the inherent dangers associated with their product or instructions concerning its use." Appellant's brief, pp. 33–34.

■ At the outset, we must address the Appellees' contention that Downs has waived this issue by failing to raise it in her pleadings. To preclude summary judgment, the nonmovant may not contend that there were factual issues concerning a theory of recovery which he could have raised in his pleadings, but did not. *Keane v. Pachter,* 598 N.E.2d 1067, 1071 (Ind.Ct.App.1992), *reh'g denied, trans. denied; Funk v. Funk,* 563 N.E.2d 127, 131 (Ind.Ct.App.1990), *trans. denied.* However, because the Appellees were given adequate time to respond to this theory of liability in their replies to Downs' brief

asserting this theory and because this issue was presented to the trial court during the summary judgment hearing, we will address the merits of Downs' challenge.

In Indiana, actions for strict liability in tort are governed by the Product Liability Act, I.C. §§ 33–1–1.5–1, *et seq. York v. Union Carbide Corp.,* 586 N.E.2d 861, 867 (Ind. Ct.App.1992); *see Senco Prod., Inc. v. Riley,* 434 N.E.2d 561, 567 (Ind.Ct.App.1982), *reh'g denied.* The section imposing strict liability provides in part:

"(a) ... a person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or the user's or consumer's property is subject to liability for physical harm caused by that product to the user or consumer or to the user's or consumer's property if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition, and if:

(1) The seller is engaged in the business of selling such a product; and

(2) The product is expected to and does reach the user or consumer without substantial alteration in the condition in which it is sold by the person sought to be held liable under this chapter.

(b) The rule stated in subsection (a) applies although:

(1) The seller has exercised all reasonable care in the manufacture and preparation of the product; and

(2) The user or consumer has not bought the product from or entered into any contractual relation with the seller.

However, in any action based on an alleged design defect in the product or based on an alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product or in providing the warnings or instructions."

I.C. § 33–1–1.5–3(a), (b). A product is in a defective condition under this chapter if:

"at the time it is conveyed by the seller to another party, it is in a condition:

(1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and

(2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption.

(b) A product is defective under this chapter if the seller fails to:

(1) properly package or label the product to give reasonable warnings of danger about the product; or

(2) give reasonably complete instructions on proper use of the product; when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer.

(c) A product is not defective under this chapter if it is safe for reasonably expectable handling and consumption. If an injury results from handling, preparation for use, or consumption that is not reasonably expectable, the seller is not liable under this chapter.

(d) A product is not defective under this chapter if the product is incapable of being made safe for its reasonably expectable use, when manufactured, sold, handled, and packaged properly."

I.C. § 33–1–1.5–2.5.

■ Pursuant to this statute, a defendant is liable when it "puts into the stream of commerce any product without reasonable (adequate) warnings thereby leaving it in a condition unreasonably dangerous to any user, if such warnings could have been given in the exercise of reasonable diligence." *Jarrell*, 528 N.E.2d at 1166. The failure to adequately warn cannot alter the basic nature of the product, but may render the product unreasonably dangerous. *Id.* While warnings cannot make a dangerous product safe, such warnings may avert liability. *Id.*

In her brief, Downs makes clear that she is not arguing that the Appellees are strictly liable for failing to provide warnings to the Downs, but "only that it was Vesta's and Panhandle's failure to provide warnings to Montezuma which triggered their liability under the [product liability] statute." Appellant's brief, p. 36, n. 17.[10]

■ ■ Under the Product Liability Act, a product may be deemed "defective" if not accompanied by the appropriate warnings as to its dangerous characteristics and properties. I.C. § 33–1–1.5–2.5(b)(1). A party making a claim of liability must show that the defendant "failed to exercise reasonable care *under the circumstances* in designing the product or in providing the warnings or instructions." I.C. § 33–1–1.5–3 (emphasis added). Actual knowledge and appreciation of specific dangers associated with a product will bar recovery for injury caused in the use of that product. *Koske v. Townsend Engineering Co.*, 551 N.E.2d 437, 441 (Ind.1990).[11] Further, no additional warning must be furnished where such warnings would not add to the user's understanding of the characteristics of the product. *Shanks*, 416 N.E.2d at 837.

■ Specifically, Downs contends that the Appellees had a duty to "warn Montezuma about such things as using bare steel lines to distribute the product or using the proper amount of odorant to ensure that their unodorized product would be made safer." Appellant's brief, p. 34. We disagree.

First, we note that a condition for liability for putting into the stream of commerce a "product unreasonably dangerous to any user" is that "the product is expected to and does reach the user or consumer without substantial alteration in the condition in which it is sold by the person sought to be held liable." I.C. § 33–1–1.5–3(a). As we noted earlier, there is no question that the unodorized gas supplied by Vesta and transported by Panhandle was expected to be

---

10. Downs' claim under § 388 of the Restatement (Second) of Torts dealt with the Appellees' duty to warn the Downs. Under this product liability theory, Downs only asks us to consider whether there was a duty to warn Montezuma.

11. In *Koske*, our supreme court held that while it was not appropriate to determine what dangers the user "should have known" under an objective standard, it is still appropriate to consider what the user of the product actually knew in regards to the dangers associated with a product. *Koske*, 551 N.E.2d at 441.

substantially altered by the addition of odorant by Montezuma.

Second, section (a) notwithstanding, the designated evidence indicates that Montezuma had actual knowledge of the dangers associated with the distribution and handling of natural gas. Section (b) of the statute states that where the action is based on a failure to warn, as it is here, it must be found that "the manufacturer or seller failed to exercise reasonable care *under the circumstances* ... in providing the warnings or instructions." I.C. § 33–1–1.5–3(b) (emphasis added). As we noted under our § 388 analysis, there was no information about natural gas or the handling of gas that could have been provided by the Appellees that would have improved upon the knowledge Montezuma already possessed. *See Shanks*, 416 N.E.2d at 837. As we held under § 388, we now also hold under I.C. § 33–1–1.5–3 that the supplier has no duty to warn a gas distributor if the distributor already has adequate knowledge of the dangers associated with the gas it purchases. *See Jones*, 219 Kan. at 635–636, 549 P.2d at 1392. Thus, we do not find that the Appellees "failed to exercise reasonable care under the circumstances." I.C. § 33–1–1.5–3(b). Therefore, we conclude that the Appellees are not liable under the Product Liability Act.

### Conclusion

Because we conclude that there is no genuine issue of material fact with respect to each of the theories of negligence raised by Downs, we hold that summary judgment in favor of the Appellees is appropriate. *See Rosi*, 615 N.E.2d at 434.

For the foregoing reasons, we affirm the trial court's judgment in all respects.

Affirmed.[12]

RUCKER and FRIEDLANDER, JJ., concur

12. Two other cases have been brought before this court involving different defendants as a result of the accident. These cases are cited as *Town of Montezuma v. Downs*, 685 N.E.2d 108 (Ind.Ct. App.1997), *trans. denied* and *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155 (Ind.Ct.App. 1997), *reh'g denied, trans. pending*.